FILED

2008 AUG -6 PM 12:52

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

1  JOHN E. BIRKENHEIER
   Email: birkenheierj@sec.gov
2  ANDREA R. WOOD
   Email: woodar@sec.gov
3  MARGARET GEMBALA NELSON
   Email: nelsonm@sec.gov
4  U.S. Securities and Exchange Commission
   175 W. Jackson Blvd., Suite 900
5  Chicago, Illinois  60604
   Telephone:  (312) 353-7390
6  Facsimile:  (312) 353-7398

7  LOCAL COUNSEL
   DAVID J. VAN HAVERMAAT, Cal. Bar No. 175761
8  Email: vanhavermaatd@sec.gov
   U.S. Securities and Exchange Commission
9  5670 Wilshire Blvd., 11th Floor
   Los Angeles, California  90036
10 Telephone:  (323) 965-3998
   Facsimile:  (323) 965-3908
11 Attorneys for Plaintiff
   U.S. Securities and Exchange Commission

12

13            UNITED STATES DISTRICT COURT

14           CENTRAL DISTRICT OF CALIFORNIA

15 SECURITIES AND EXCHANGE          | Case No.
16 COMMISSION,                      |
17          Plaintiff,              | SACV08-880  JVS (ANx)
18     vs.                          |
                                    | COMPLAINT FOR VIOLATIONS
19 ANGEL ACQUISITION CORP. f/k/a    | OF THE FEDERAL SECURITIES
   PALOMAR ENTERPRISES, INC.,       | LAWS
20 MARSHALL HOLDINGS               |
   INTERNATIONAL, INC. f/k/a        |
21 GATEWAY DISTRIBUTORS, LTD.,      |
   NW TECH CAPITAL, INC. f/k/a      |
22 CYBERTEL CAPITAL CORP.,          |
   WINSTED HOLDINGS, INC., ZANN     |
23 CORP., RICHARD A. BAILEY, MARK   |
   T. ELLIS AND FLORIAN R. TERNES,  |
24                                  |
25          Defendants.             |



26

27

28

1  Plaintiff Securities and Exchange Commission ("Commission") alleges as
2  follows:

3  ## JURISDICTION AND VENUE

4  1.    This Court has jurisdiction over this action pursuant to Sections 20(b),
5  20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C.
6  §§ 77t(b), 77t(d)(1) and 77v(a).  Defendants, directly or indirectly, made use of the
7  means or instrumentalities of interstate commerce, the mails or the facilities of a
8  national securities exchange in connection with the transactions, acts, practices and
9  courses of business alleged in this Complaint.

10  2.    Venue is proper in this Court pursuant to Section 22(a) of the
11  Securities Act, 15 U.S.C. § 77v(a), because certain of the transactions, acts,
12  practices and courses of conduct constituting violations of the federal securities
13  laws occurred within this district.  Defendant Mark Ellis resides and transacts
14  business in this district and defendants Angel Acquisition Corp. f/k/a Palomar
15  Enterprises, Inc. ("Angel Acquisition"), Marshall Holdings International, Inc. f/k/a
16  Gateway Distributors, Ltd. ("Marshall Holdings"), NW Tech Capital, Inc. f/k/a
17  Cybertel Capital Corp. ("NW Tech"), Winsted Holdings, Inc. ("Winsted
18  Holdings"), Zann Corp., Richard A. Bailey ("Bailey") and Florian R. Ternes
19  ("Ternes") all transact business in this district or transacted business in this district
20  during the time period relevant to this Complaint.

21  ## SUMMARY

22  3.    This action concerns the abuse of Form S-8 registration statements by
23  several microcap companies.  From mid-2002 through mid-2005 (the "relevant
24  period"), Angel Acquisition, Marshall Holdings, NW Tech, Winsted Holdings and
25  Zann Corp. (collectively, "Issuer Defendants") distributed billions of shares of
26  common stock to the public in unregistered securities offerings disguised as
27  employee stock option programs.  The Issuer Defendants improperly registered the

28

1   shares underlying the stock options granted under the programs on Form S-8 and

2   then received the bulk of the proceeds from the sales of the shares as payment for the

3   exercise price of the options.

4        4.     As designed and implemented, the so-called employee stock option

5   programs actually functioned as public offerings in which the Issuer Defendants used

6   their employees as conduits to the market so that they could raise millions of dollars

7   in capital without complying with the registration requirements of the Securities Act.

8   The money received by the Issuer Defendants under the programs greatly exceeded

9   their revenues from operations and allowed them to fund their struggling

10  operations.  Moreover, the employee stock option programs resulted in billions of

11  shares being issued to the public in unregistered transactions, causing a severe

12  dilution of existing shareholder interests.

13       5.     In addition to the Issuer Defendants, the Commission asserts claims

14  against three individuals, who were officers and directors of certain Issuer

15  Defendants, based on their improper conduct in connection with the employee

16  stock option programs.  Defendant Ellis controlled the program at Winsted

17  Holdings.  During the course of the program, Winsted had practically no revenues

18  from operations yet used the proceeds received from its employee stock option

19  program to fund $1 million in salary payments to Ellis.  Defendants Bailey and

20  Ternes were responsible Marshall Holdings' employee stock option program and

21  received significant increases to their salaries during the course of the program.

22       6.     Through the activities alleged in this Complaint, the defendants,

23  directly or indirectly, engaged in and, unless enjoined, will continue to engage in

24  transactions, acts, practices or courses of business which violate Sections 5(a) and

25  5(c) of the Securities Act, 15 U.S.C. §§77e(a) and (c).  The Commission seeks to

26  permanently enjoin the defendants from engaging in the wrongful conduct alleged

27  in this Complaint and also seeks other relief, including disgorgement of ill-gotten

28

1 | gains together with prejudgment interest and, in the case of Marshall Holdings,

2 | Ellis, Bailey and Ternes, civil money penalties.

3 | **DEFENDANTS**

4 | 7.   **Angel Acquisition** is a Nevada corporation with its principal office in

5 | Carson City, Nevada.  Its business operations are located in Carlsbad, California

6 | and Cardiff, California.  The company provides mortgage brokerage services and

7 | acquires and develops real estate.  During the relevant period, Angel Acquisition

8 | was a reporting company under Section 13 of the Securities Act, 15 U.S.C. §78m.

9 | Its stock is registered with the Commission under Section 12(g) of the Securities

10 | Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78l, and is listed on the OTC

11 | Bulletin Board.

12 | 8.   **Marshall Holdings** is a Nevada corporation with its principal place of

13 | business in Las Vegas, Nevada.  Through its subsidiaries, it sells and distributes

14 | nutritional, health and skin products through network marketing and websites.

15 | Marshall Holdings is a reporting company under Section 13 of the Securities Act,

16 | 15 U.S.C. § 78m.  Its stock is registered with the Commission under Section 12(g)

17 | of the Exchange Act, 15 U.S.C. § 78l, and is listed on the OTC Bulletin Board.

18 | 9.   **NW Tech** is a Nevada corporation with its principal place of business

19 | in Vancouver, Washington.  During the relevant period, the company was located

20 | in Vista, California and primarily provided telecommunication services.  NW Tech

21 | is a reporting company under Section 13 of the Securities Act, 15 U.S.C. § 78m.

22 | Its stock is registered with the Commission under Section 12(g) of the Exchange

23 | Act, 15 U.S.C. § 78l, and is listed on the OTC Bulletin Board.  The company

24 | currently provides consulting and management services in the areas of

25 | telecommunications, wireless and broadband.

26 | 10.   **Winsted Holdings** is a Florida corporation currently based in

27 | Northfield, Illinois.  During the relevant period, the company's principal place of

28 |

4

1  business was Newport Beach, California and it was a reporting company under

2  Section 13 of the Securities Act, 15 U.S.C. § 78m. Its stock was registered with

3  the Commission under Section 12(g) of the Exchange Act, 15 U.S.C. § 78l, and

4  was listed on the OTC Bulletin Board. Winsted Holdings previously provided

5  telecommunications services but currently focuses on acquiring interests in

6  emerging private companies.

7       11.    **Zann Corp.** is a Nevada corporation with its principal place of

8  business in Clermont, Florida. During the relevant period, the company operated

9  out of Fenton, Michigan and focused on acquiring and developing other

10  businesses. It was a reporting company under Section 13 of the Securities Act, 15

11  U.S.C. § 78m, and its stock was registered with the Commission under Section

12  12(g) of the Exchange Act, 15 U.S.C. § 78l, and was listed on the OTC Bulletin

13  Board.

14       12.    **Bailey**, age 52, is a resident of Las Vegas, Nevada. He serves as the

15  Chief Executive Officer, Chief Financial Officer, President and Chairman of

16  Marshall Holdings. During the relevant period, Bailey, along with Ternes, directed

17  Marshall Holdings' use of its employee stock option program.

18       13.    **Ellis**, age 42, is a resident of Irvine, California. During the relevant

19  period, he was the Chief Executive Officer, Chief Financial Officer, President,

20  Secretary, Director and controlling shareholder of Winsted Holdings. Ellis

21  directed the company's ESIP program. Ellis resigned his positions with Winsted

22  Holdings in June 2007.

23       14.    **Ternes**, age 59, is a resident of Las Vegas, Nevada. He serves as the

24  Chief Operating Officer, Secretary and Director of Marshall Holdings. Ternes,

25  along with Bailey, directed the company's use of its employee stock option

26  program.

27

28

1

## FACTS

2 **I.     Overview of the Issuer Defendants' ESIP Programs**

3        15.    Starting in mid-2002, the Issuer Defendants implemented employee

4 stock option programs that were virtually identical in design and implementation.

5 The programs were adopted pursuant to plan documents titled Employee Stock

6 Incentive Plans ("ESIPs").

7        16.    The Issuer Defendants learned about the ESIP programs from

8 Alexander & Wade, Inc. ("AWI"), a self-described investment banking firm

9 located in San Diego, California, hired by the Issuer Defendants to provide

10 consulting services.  AWI pitched the ESIP programs to the Issuer Defendants in

11 part as a way to raise money.

12        17.    The Issuer Defendants registered the shares underlying the stock

13 options on Form S-8 registration statements filed with the Commission.  The ESIP

14 documents were attached as exhibits to the Form S-8s.

15        18.    Pursuant to the Securities Act, registrants may use Form S-8 to

16 register securities issued to compensate employees and consultants for *bona fide*

17 services not connected with the offer or sale of securities.  Because of the

18 compensatory purpose and the presumed familiarity of employees and consultants

19 with the registrant's business, Form S-8's disclosure requirements are abbreviated

20 as compared to statements registering shares used to raise capital.

21        19.    As implemented by the Issuer Defendants, however, the ESIP

22 programs functioned as public offerings in which the Issuer Defendants used their

23 employees as conduits to the markets so that they could raise capital.

24        20.    The ESIP programs had three features that, taken together, virtually

25 guaranteed that the options would be exercised and the underlying shares

26 simultaneously sold to the public at or near the time the options were granted to

27 employees:

28

a.    First, the options' exercise price hinged on the market value of an Issuer Defendant's stock at the time of exercise (versus the date of grant). The Issuer Defendants set the exercise price at a high percentage, typically 85%, of the proceeds received from the sale of shares underlying the options. This ensured that the options were immediately "in the money" – that is, the exercise price was always less than the market price whenever the options were exercised – and that the Issuer Defendant, not the employee, would receive most of the benefit from an increase in stock price after the time of grant.

b.    Second, the options vested immediately, meaning that there was no waiting period after the options were granted or any other condition that needed to be met before the options could be exercised.

c.    Third, a cashless method was used to exercise the options so that the exercise price was remitted to the Issuer Defendant from the sales proceeds of the shares underlying the options.  Accordingly, the employees did not have to pay any money out-of-pocket to exercise the options.

21.    Under the ESIP programs, the Issuer Defendants and virtually all of their employees had brokerage accounts at the same broker-dealer firm, Finance 500, Inc. in Irvine, California.

22.    When Finance 500 opened the accounts for the employees, it typically obtained standing orders or other instructions from the employees that the options should be exercised immediately after grant.

23.    Also, Finance 500 required the employees to fill out and have notarized multiple blank authorizations before the Issuer Defendants granted any options.  The Issuer Defendants collected and forwarded these authorizations to Finance 500 as part of setting up the ESIP programs.  The authorizations gave Finance 500 authority to (i) sell the shares underlying any options granted by the

7

1 │ Issuer Defendants and (ii) exercise the options using the sales proceeds from the
2 │ underlying shares to pay the exercise price.

3 │     24.    When the Issuer Defendants granted options, they sent Finance 500
4 │ share certificates representing the number of Form S-8 shares underlying the
5 │ options granted. Upon receipt of the certificates, Finance 500 relied on the
6 │ standing orders and authorizations from the employees to sell the shares underlying
7 │ the options to the public. It then calculated the option exercise price at 85% of the
8 │ sales price and routed that amount to the Issuer Defendant accounts and the
9 │ remainder, minus fees, to the employee accounts.

10 │     25.    The Issuer Defendants issued options to employees frequently,
11 │ sometimes as many as five times in a given month.

12 │     26.    In some cases, the employees were not notified of an option grant
13 │ until after they received their portion of the sales proceeds from the underlying
14 │ shares.

15 │     27.    The employees received relatively modest amounts under the
16 │ programs (approximately 7%-8% of the sales proceeds, after brokerage fees and
17 │ costs) compared to the Issuer Defendants. Accordingly, the ESIP programs
18 │ provided no practical incentive for an employee to work to increase the stock price
19 │ for an Issuer Defendant because the employee's share of the sales proceeds was
20 │ always limited to a small percentage.

21 │     28.    In contrast, the Issuer Defendants received the vast majority of the
22 │ sales proceeds from the underlying stock as payment for the exercise price ("ESIP
23 │ proceeds"). These amounts greatly exceeded the revenues earned by the Issuer
24 │ Defendants.

25 │     29.    The Issuer Defendants relied on the ESIP proceeds to fund the
26 │ operations of their otherwise failing businesses.

8

30.     The ESIP programs resulted in billions of shares of each Issuer Defendant's stock being sold to the public, which severely diluted the ownership interests of existing shareholders.  Throughout the programs, the Issuer Defendants' stock generally traded at fractions of a penny and their stock prices trended downward.

31.     The design of the ESIP programs (*i.e.*, the high-percentage exercise price that was always "in the money," the immediate vesting and the use of the cashless exercise method that allowed exercise without any payment by the employees up-front) – combined with the standing orders to exercise immediately – all but guaranteed that the underlying shares were sold to the public nearly immediately upon the grant of the stock options.

32.     By virtue of the design and implementation of the ESIP programs, the Issuer Defendants controlled the timing of the sales to the public through the timing of their option grants.  This allowed the Issuer Defendants to anticipate receipt of ESIP proceeds shortly after granting options.

33.     The ESIP programs essentially functioned as public offerings in that the Issuer Defendants used their employees as conduits to raise significant amounts of capital in the marketplace.

34.     Because Form S-8 cannot be used to raise capital, no registration statements were in effect or filed as to the shares issued under the ESIP programs.

**II.     Additional Allegations As To Specific Defendants**

    A.     <u>Angel Acquisition's ESIP Program</u>

35.     Paragraphs 1 through 34 are realleged and incorporated by reference herein.

36.     One month before it implemented its ESIP program, Angel Acquisition was essentially a shell company in very poor financial condition.  At the time it started the program in June 2003, the company had just undergone a

change in control and had implemented a new business plan.

37.   Angel Acquisition's new management learned of the ESIP program from AWI. The firm told the company that the program would not only grow the company by allowing it to recruit, train and retain employees, but also provided the benefit of generating proceeds that could be used for operations.

38.   Angel Acquisition implemented the ESIP program to generate money to fund the business and to compensate and retain employees.

39.   The following table summarizes Angel Acquisition's Form S-8 filings under the program:

| # | S-8 Filing Date | # of Shares Registered |
|---|---|---|
| 1 | 6/23/2003 | 16,000,000 |
| 2 | 8/13/2003 | 70,000,000 |
| 3 | 10/14/2003 | 23,000,000 |
| 4 | 11/21/2003 | 90,000,000 |
| 5 | 2/12/2004 | 160,000,000 |
| 6 | 5/28/2004 | 220,000,000 |
| 7 | 9/14/2004 | 750,000,000 |
| 8 | 10/18/2004 | 1,150,000,000 |
|   | **Total:** | **2,479,000,000** |

(This table as well as similar tables in this Complaint detail the Form S-8 filings and post-effective amendments that register the offer and sale of shares underlying the stock options issued under the ESIP programs.)

40.   Prior to the ESIP program's launch, Angel Acquisition had 31.9 million shares of common stock outstanding. Its stock was thinly traded, with daily trading volumes ranging between zero and the tens of thousands and the price ranging between $.017 and $.095. After the launch, the daily trading volume

1   significantly increased to the millions and often to the tens of millions.  Towards
2   the end of the program, the stock price fell as low as $.00019.

3       41.   For the first half of 2003, Angel Acquisition had no revenue or
4   operations, and suffered a net loss of $272,000.  After the company launched the
5   program in June 2003, the ESIP proceeds far exceeded revenues:

6
| Year | Revenues | ESIP Proceeds |
|---|---|---|
| 2003 | $9,000 | $749,000 |
| 2004 | $737,000 | $2,358,000 |
| 2005 (first 3 mos.) | $87,000 | $182,000 |
| **Totals:** | **$833,000** | **$3,289,000** |

11  (The figures for revenues and ESIP proceeds in this Complaint are rounded to the
12  nearest thousand.)

13      42.   The company operated at a loss during the course of the program and
14  used the ESIP proceeds to fund its business.

15      43.   Angel Acquisition acknowledged that it used the ESIP program to
16  raise capital and fund operations in its periodic filings with the Commission.

17      44.   For example, in the company's Form 10-Q for the quarterly period
18  ended March 31, 2004, Angel Acquisition stated:

19        The Company raises capital through the issuance and exercise of
20        options under the Company's ESIP.  During the three months ended
21        March 31, 2004 the Company raised $943,735 net of brokerage
22        commissions through its ESIP.

23      45.   Furthermore, in its Form 10-Q for the quarterly period ended
24  September 30, 2004, Angel Acquisition stated:

25        Cash flows provided from financing activities w[ere] $2,487,910 for
26        the nine months ended September 30, 2004.  This was mainly from

27

28

11

proceeds received from officers and employees for stock options exercised during this period in the amount of $2,419,590.

46.     Angel Acquisition ended its ESIP program in early 2005.

B.     Marshall Holdings' ESIP Program

47.     Paragraphs 1 through 34 are realleged and incorporated by reference herein.

48.     Before it implemented the ESIP program, Marshall Holdings was in poor financial condition. The company's 2002 financial statements show that, while it earned $1.15 million in revenues, it recognized a net loss of $2.8 million.

49.     Bailey and Ternes decided to implement the ESIP program to bring money into the company and to retain employees through increased pay.

50.     The following table summarizes Marshall Holdings' Form S-8 filings under the ESIP program:

| # | S-8 Filing Date | # of Shares Registered |
|---|---|---|
| 1 | 4/11/2003 | 1,000,000,000 |
| 2 | 1/22/2004 | 900,000,000 |
| 3 | 3/17/2004 | 2,000,000,000 |
| 4 | 4/22/2004 | 2,000,000,000 |
| 5 | 5/27/2004 | 3,009,243,200 |
| 6 | 6/18/2004 | 3,884,253,600 |
| 7 | 8/24/2004 | 8,000,000,000 |
| | Total: | 16,793,496,800 |

51.     Just prior to the ESIP program launch, Marshall Holdings had 4.2 billion shares of common stock outstanding. During the course of the ESIP program, the daily trading volume for the company's stock was regularly in the

1   tens and hundreds of millions and, on a few occasions, exceeded one billion.  The

2   stock price also fell as low as $.00013.

3       52.   Marshall Holdings received ESIP proceeds that were significantly

4   greater than revenues earned during the existence of the program:

| Year | Revenues | ESIP Proceeds |
|---|---|---|
| 2003 | $1,120,000 | $1,888,507 |
| 2004 | $1,150,000 | $6,857,743 |
| 2005 (first 6 mos.) | $391,000 | $227,783 |
| **Totals:** | **$2,661,000** | **$8,974,033** |

10       53.   While Marshall Holdings consistently operated at a loss, the company

11   was able to fund operations, acquire assets and pay debt because of its receipt of

12   ESIP proceeds.

13       54.   Marshall Holdings acknowledged that it used the ESIP program to

14   raise funds for operations in its periodic filings with the Commission.  For

15   example, in its Form 10-K for the fiscal year ended 2003, Marshall Holdings

16   stated:

17         In 2003 an Employee Stock Incentive Plan (ESIP) was set up and[,]

18         through stock issues to the public, we raised $1,888,507 in cash to

19         provide the vehicle to finance the activities for 2003. . . . [I]t is likely

20         that we may rely heavily on the issuance of our shares to pay

21         consultants and other professionals and to raise cash during 2004.

22       55.   Similarly, in its Form 10-Q for the quarterly period ended March 31,

23   2004, Marshall Holdings stated:

24         During January through March 2004, the company issued the

25         remaining 447,745,400 shares authorized out of the 1,000,000,000

26         shares approved in the ESIP Plan 2003. Also during January through

27         March 2004, the company issued 2,581,432,000 shares out of the

28

1          2,900,000,000 total shares approved as of March 31, 2004 in the

2          ESIP Plans 2004. . . . The total net proceeds received from these stock

3          issues during January through March 2004 are $2,310,487.

4 The Form 10-Q further added:

5          We had a net working capital deficit of $2,860,000 at the end of

6          March 31, 2004, as compared to a $4,284,000 deficit at the end of

7          December 31, 2003.  Our working capital deficit decreased

8          $1,424,000 primarily as a result of raising additional capital through

9          stock issues of $2,310,000.

10       56.    In its Form 10-Q for the quarterly period ended June 30, 2004,

11 Marshall Holdings stated:

12          Cash flow provided from financing activities was $6,084,206 for the

13          six months ended June 30, 2004. This was mainly from proceeds

14          received from employees for stock options exercised during this

15          period of $5,099,411. . . .

16       57.    Bailey and Ternes were the primary decision-makers behind Marshall

17 Holdings' ESIP program.  They decided when to file Form S-8s, decided how

18 many shares to register on those Form S-8s, signed the Form S-8s and determined

19 when to grant options to particular employees.

20       58.    Bailey's and Ternes' salaries significantly increased during the course

21 of the program.  In 2003, when the program first began, Bailey earned $101,500

22 and Ternes $89,500.  Bailey's salary increased to $216,000 in 2004 and $240,000

23 in 2005.  Ternes' salary increased to $186,000 in 2004 and $204,000 in 2005.

24       59.    Marshall Holdings continued to issue options under its ESIP program

25 until Spring 2005.

26

27

28

14

C.    NW Tech's ESIP Program

60.    Paragraphs 1 through 34 are realleged and incorporated by reference herein.

61.    NW Tech learned of the ESIP program from AWI, which told NW Tech that the ESIP program would help the company pay its bills and retain its employees.

62.    According to the Independent Client Service Agreement between NW Tech and AWI, NW Tech retained the consulting firm to "[a]dvise, assist and provide all documentation . . . in setting up S-8 for employee payroll and stock options to pay monthly [NW Tech's] expenses."

63.    The following table summarizes NW Tech's Form S-8 filings under the ESIP program:

| #  | S-8 Filing Date | # of Shares Registered |
|----|-----------------|------------------------|
| 1  | 7/12/02         | 6,000,000              |
| 2  | 9/20/02         | 9,000,000              |
| 3  | 12/13/02        | 20,000,000             |
| 4  | 4/11/03         | 30,000,000             |
| 5  | 6/11/03         | 100,000,000            |
| 6  | 7/3/03          | 100,000,000            |
| 7  | 9/2/03          | 450,000,000            |
| 8  | 1/14/04         | 450,000,000            |
| 9  | 6/1/04          | 750,000,000            |
| 10 | 7/23/04         | 900,000,000            |
| 11 | 8/3/04          | 4,000,000,000          |
|    | **Total:**      | **6,815,000,000**      |

64.     Prior to the launch of the ESIP program, NW Tech had 10.3 million shares of common stock outstanding with daily trading volumes in the tens of thousands and prices ranging between $.07 and $.38.  By March 2003, the shares regularly traded at tenths of a cent and, by July 2003, daily volume was regularly in the tens of millions.  When NW Tech filed its last Form S-8 on August 3, 2004, the shares were trading at $.00038 and the daily trading volume was over 31 million.

65.     When it implemented the ESIP program, NW Tech was struggling financially with revenues of $623,000 and a net loss of $701,000 for the first half of 2002.  Soon after the program's launch in July 2002, however, the ESIP proceeds began to exceed revenues earned by large margins:

| Year | Revenues | ESIP Proceeds |
|---|---|---|
| 2002 | $1,170,000 | $190,000 |
| 2003 | $844,000 | $2,311,000 |
| 2004 | $218,000 | $2,152,000 |
| 2005 (first 6 mos.) | $36,000 | $677,000 |
| **Totals:** | **$2,281,000** | **$5,330,000** |

66.     The company, which was operating at a loss during the program's existence, used the ESIP proceeds to pay its bills and run the business.

67.     NW Tech terminated the ESIP program in mid-2005.

D.     Winsted Holdings' ESIP Program

68.     Paragraphs 1 through 34 are realleged and incorporated by reference herein.

69.     Ellis assumed control of Winsted Holdings in February 2003. He implemented Winsted Holdings' ESIP program in April 2003.  At the time, the company had no operations and was in poor financial condition with revenues in 2002 of $0 and a net loss of $778,000.

16

70.    The following table summarizes Winsted Holdings' Form S-8 filings under its ESIP program:

| # | S-8 Filing Date | # of Shares Registered |
|---|---|---|
| 1 | 4/17/2003 | 40,000,000 |
| 2 | 5/29/2003 | 75,000,000 |
| 3 | 6/20/2003 | 310,000,000 |
| 4 | 8/13/2003 | 255,000,000 |
| 5 | 4/2/2004 | 350,000,000 |
| 6 | 5/27/2004 | 210,000,000 |
| 7 | 7/26/2004 | 300,000,000 |
| 8 | 9/3/2004 | 120,000,000 |
| 9 | 10/18/2004 | 200,000,000 |
| 10 | 1/18/2005 | 400,000,000 |
| | Total: | 2,260,000,000 |

71.    Just prior to the ESIP program's implementation, the company had 376 million shares of common stock outstanding, a share price ranging between $.002 and $.019 and a daily trading volume consistently below one million shares and often zero shares. After the launch of the program, the daily trading volume rose so that it was consistently in the tens of millions and, on multiple occasions, exceeded one hundred million shares. Additionally, the price fell as low as $.00063.

72.    The proceeds received under the ESIP program dwarfed the company's practically non-existent revenues:

17

| Year | Revenues | ESIP Proceeds |
|---|---|---|
| 2003 | $0 | $1,283,162 |
| 2004 | $24,000 | $1,087,050 |
| 2005 (first 3 mos.) | $0 | $63,973 |
| **Totals:** | **$27,000** | **$2,434,185** |

73.     The company operated at a loss throughout the program and relied on ESIP proceeds as its only means to pay expenses and fund operations, including Ellis' salary.  In 2003, the company used 27% of the ESIP proceeds to pay a $350,000 salary to Ellis.  In 2004, the company used 64% of the ESIP proceeds to pay a $692,000 salary to Ellis.

74.     Winsted Holdings acknowledged that it used the ESIP program to finance its operations in its periodic filings with the Commission.  For example, its Form 10-K for the fiscal year ended December 31, 2003, Winsted Holdings stated that it "financed its operations entirely with . . . [the] proceeds from the exercise of options to acquire its common stock."

75.     Similarly in its Form 10-K for the fiscal year ended December 31, 2004, Winsted Holdings stated that it "financed its operations entirely with . . . proceeds from the exercise of options to acquire its common stock."

76.     Ellis was the primary decision-maker for Winsted Holdings' ESIP program.  He decided when to file Form S-8s, decided how many shares to register on those statements, signed the statements and determined when to grant options to particular employees.

77.     Winsted Holdings terminated its ESIP program in early 2005.

E.    Zann Corp.'s ESIP Program

78.    Paragraphs 1 through 34 are realleged and incorporated by reference herein.

79.    When Zann Corp. implemented its ESIP program in June 2003, the company had recently undergone a change in control and was essentially a shell company.

80.    Zann Corp. first learned of the ESIP program after contacting AWI to seek help in locating funding.  AWI mentioned the ESIP program while discussing potential funding options.

81.    Zann Corp. decided to implement the ESIP program to receive the ESIP proceeds and to incentivize employees.

82.    The following table summarizes Zann Corp.'s Form S-8 filings under the ESIP program:

| # | S-8 Filing Date | # of Shares Registered |
|---|---|---|
| 1 | 6/6/03 | 33,000,000 |
| 2 | 8/29/03 | 20,860,000 |
| 3 | 9/29/03 | 22,000,000 |
| 4 | 10/14/03 | 26,000,000 |
| 5 | 11/13/03 | 78,000,000 |
| 6 | 1/27/04 | 100,000,000 |
| 7 | 6/17/04 | 160,000,000 |
| 8 | 9/24/04 | 130,000,000 |
| 9 | 11/4/04 | 87,000,000 |
| 10 | 12/1/04 | 800,000,000 |
| | **Total:** | **1,456,860,000** |

83.   Before the ESIP program's launch, Zann Corp. had 52.8 million shares of common stock outstanding. Its stock often had no daily trading volume and, when it did have volume, it was in the tens of thousands with a price ranging between $.0115 and $.05. After the program's launch, the stock's daily trading volume was in the millions and tens of millions. The stock price was at a tenth of a cent and, by October 2004, was at a thousandth of a cent.

84.   Zann Corp. was in poor financial condition when it implemented its ESIP program with 2002 revenues of $783,000 and a net loss of $11.5 million.

85.   Under the program, the company received significant amounts of ESIP proceeds compared to its almost non-existent revenues:

| Year | Revenues | ESIP Proceeds |
|---|---|---|
| 2003 | $0 | $1,192,659 |
| 2004 | $1,400 | $1,741,499 |
| 2005 (first 6 mos.) | $0 | $289,652 |
| **Totals:** | **$1,400** | **$3,223,810** |

86.   Without the ESIP proceeds, the company would not have survived. Zann Corp had little to no operations and consistently operated at a loss during the program's existence. The company used ESIP proceeds to pay expenses such as salaries, inventory and debt reduction.

87.   Zann Corp. ended the ESIP program in Spring 2005.

## FIRST CLAIM FOR RELIEF

### Unregistered Offer and Sale of Securities

### Violations of Section 5(a) and 5(c) of the Securities Act

88.   Paragraphs 1 through 87 are realleged and incorporated by reference herein.

89.   The defendants, and each of them, by engaging in the conduct described above, directly or indirectly, made use of means or instruments of

1 | transportation or communication in interstate commerce or of the mails, to offer to
2 | sell or to sell securities, or to carry or cause such securities to be carried through
3 | the mails or in interstate commerce for the purpose of sale or for delivery after
4 | sale.

5 | 90.    No registration statements have been filed with the Commission or
6 | have been in effect with respect to any of the offerings alleged herein.

7 | 91.    By reason of the foregoing, each of the defendants violated and,
8 | unless enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities
9 | Act, 15 U.S.C. §§ 77e(a) and 77e(c).

10 | **PRAYER FOR RELIEF**

11 | WHEREFORE, the Commission respectfully requests that the Court:

12 | **I.**

13 | Find that Defendants committed the violations alleged above.

14 | **II.**

15 | Issue orders, in a form consistent with Rule 65(d) of the Federal Rules of
16 | Civil Procedure, permanently enjoining defendants and their officers, agents,
17 | servants, employees and attorneys, and those persons in active concert or
18 | participation with them who receive actual notice of the order or judgment by
19 | personal service or otherwise, and each of them, from directly or indirectly
20 | violating Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and (c).

21 | **III.**

22 | Order the defendants to disgorge all ill-gotten gains that they received as a
23 | result of the acts and courses of conduct complained of herein, together with
24 | prejudgment interest thereon.

25 | **IV.**

26 | Order defendants Marshall Holdings, Ellis, Bailey and Ternes to pay civil
27 | penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d).

28 |

## V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VI.

Grant such other and further relief as the Court may determine to be just and necessary.

DATED: August 6, 2008                    Respectfully submitted,

David J. Van Havermaat
Attorney for Plaintiff
Securities and Exchange Commission

David J. Van Havermaat, Cal. Bar No. 175761
U.S. Securities and Exchange Commission
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone: (323) 965-3998
Facsimile: (323) 965-3908

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION , <br><br> PLAINTIFF(S) <br><br> v. <br><br> ANGEL ACQUISITION CORP., f/k/a PALOMAR ENTERPRISES, INC., MARSHALL HOLDINGS INTERNATIONAL, INC. f/k/a GATEWAY DISTRIBUTORS, LTD., NW TECH CAPITAL, INC. f/k/a CYBERTEL CAPITAL CORP., WINSTED HOLDINGS, INC., ZANN CORP., RICHARD A. BAILEY, MARK T. ELLIS AND FLORIAN R. TERNES,                 DEFENDANTS | CASE NUMBER <br><br> SACV08-880  JVS(AN) <br><br><br> **SUMMONS** |

TO:     DEFENDANT(S):  Marshall Holdings Int'l, Inc., Richard A. Bailey, Mark T. Ellis & Florian A. Ternes

        A lawsuit has been filed against you.

        Within   20   days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney,   David J. Van Havermaat   , whose address is  SEC, 5670 Wilshire Blvd., 11th Fl., Los Angeles, CA 90036   . If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

                                        Clerk, U.S. District Court

Dated:   AUG - 6 2008                   By: ___NATALIE LONGORIA___
                                                Deputy Clerk

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

1198

---

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION | SEE ATTACHMENT A |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| David J. Van Havermaat, Securities and Exchange Commission, 5670 Wilshire Boulevard., 11th Floor, Los Angeles, California 90036 (323) 965-3998 | SEE ATTACHMENT B |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☑ 1 U.S. Government Plaintiff    ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant    ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding    ☐ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from another district (specify):    ☐ 6 Multi-District Litigation    ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☑ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☐ No    ☐ **MONEY DEMANDED IN COMPLAINT: $**_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Violations of the federal securities laws. 15 U.S.C. §§ 77e(a) and 77e(c).

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☑ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | REAL PROPERTY | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 210 Land Condemnation | IMMIGRATION | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 220 Foreclosure | ☐ 462 Naturalization Application | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 230 Rent Lease & Ejectment | ☐ 463 Habeas Corpus-Alien Detainee | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 240 Torts to Land | ☐ 440 Other Civil Rights | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | ☐ 290 All Other Real Property | | | |

**FOR OFFICE USE ONLY:** Case Number: CACV08-880

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No  ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No  ☑ Yes
If yes, list case number(s): SEC v. Global Materials & Services, Inc., et al. -- simultaneously filed

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)  ☑ A. Arise from the same or closely related transactions, happenings, or events; or
☑ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☑  Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District.* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐  Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District.* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Mark Ellis -- Orange County | Angel Acquisition Corp. -- Nevada; Marshall Holdings International, Inc. -- Nevada; NW Tech Capital, Inc. -- Washington; Winsted Holdings, Inc. -- Illinois; Zann Corp. -- Michigan; Richard Bailey -- Nevada; Florian Ternes -- Nevada |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District.* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County | San Diego County |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date  8/6/08

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

# ATTACHMENT A TO CIVIL COVER SHEET

<u>List of Defendants</u>
Angel Acquisition Corp. f/k/a Palomar Enterpises, Inc.
Marshall Holdings International, Inc. f/k/a Gateway Distributors, Ltd.
NW Tech Capital, Inc. f/k/a Cybertel Capital Corp.
Winsted Holdings, Inc.
Zann Corp.
Richard A. Bailey
Mark T. Ellis
Florian R. Ternes

## ATTACHMENT B TO CIVIL COVER SHEET

List of Known Attorneys
Susann K. Narholm, Esq.
Bienert & Miller
115 Avenida Miramar
San Clemente, CA 92672
(949) 369-3700
*Attorney for Angel Acquisition Corp. f/k/a Palomar Enterpises, Inc.*

Ted S. Helwig
Katten, Muchin, Rosenman
525 West Monroe Street
Chicago, IL  60661-3693
(312) 902-5537
*Attorney for Marshall Holdings International, Inc. f/k/a Gateway Distributors, Ltd.
and Richard A. Bailey*

Arthur S. Marcus
Gersten Savage LLP
600 Lexington Avenue, 9th Floor
New York, NY  10022
(212) 752-9700
*Attorney for NW Tech Capital, Inc. f/k/a Cybertel Capital Corp.*

Richard M. Steingard
Richard M. Steingard Law Offices
800 Wilshire Blvd., Suite 1510
Los Angeles, CA  90017
(213) 622-3101
*Attorney for Florian R. Ternes*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge James V. Selna and the assigned discovery Magistrate Judge is Arthur Nakazato.

The case number on all documents filed with the Court should read as follows:

## SACV08- 880 JVS (ANx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

================================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division** | [X] **Southern Division** | [ ] **Eastern Division** |
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)       NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY